Franklin R. MARSHALL,
Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 35A02–0712–CR–1135.

Court of Appeals of Indiana.

Sept. 30, 2008.

Matthew G. Grantham, Bowers, Brewer, Garrett & Wiley, LLP, Huntington, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Zachary J. Stock, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

KIRSCH, Judge.

Following a jury trial, Franklin R. Marshall was convicted of five child molesting felonies, four as Class A felonies[1] and one as a Class B felony.[2] Marshall raises four issues, which we consolidate and restate as:

I. Whether the trial court committed errors in the admission and exclusion of evidence during trial;

II. Whether any trial court error occurred with respect to Marshall's claim that the jury saw him before or after trial being transported in handcuffs; and

III. Whether Marshall's aggregate ninety-six year sentence is inappropriate given his character.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Sisters K.B. and J.B. were born on January 5, 1983 and July 9, 1986, respectively. In 1991, while living in Tennessee, their mother, Tammy, met and began dating Marshall. Shortly thereafter, Marshall moved in with Tammy and her minor children.[3] K.B. was "around eight" years of age at the time, and J.B. was approximately five. *Tr.* at 216. K.B. and J.B. did not have a relationship with their natural fa-

ther, and Marshall became a father figure to the girls.

Tammy, Marshall, and the children moved frequently from one residence to another sometimes only staying at a location for just a month. In 1994, Tammy and Marshall moved to Huntington County, Indiana. In July 1995, K.B. and J.B. joined them. After moving to a few different residences, they moved in May 1995 to a house on Main Street, where they lived until April 1997.[4]

During that approximate two-year period when they lived in the house on Main Street, Marshall began touching and fondling K.B., who was twelve years old. He penetrated her vagina with his fingers, and he performed oral sex on her. K.B. testified that these events occurred "a couple times a week." *Tr.* at 230. When K.B. was thirteen, on an occasion when her mother was in the hospital having a hysterectomy, Marshall called K.B. "a little whore and a slut" and then had sexual intercourse with her. *Id.* at 235. A friend of the family, Rodney Bates, was in the house at the time. He saw Marshall and K.B. under the covers in Marshall's bed, and then he observed K.B. come downstairs to the bathroom on the first floor. She was disoriented and crying, and he asked her why she was upset, but she did not respond, and proceeded to the shower. K.B. said that the sexual intercourse continued "probably, once or twice a week." *Id.* at 238. She explained that Marshall would "force" her to engage in the sex and threatened her that if she ever told anyone he would harm her and her family. K.B.

---

1. *See* IC 35–42–4–3(a)(1).

2. *See* IC 35–42–4–3(a).

3. Tammy also had two other children: an older daughter, and a son born between K.B. and J.B. For the most part, they did not live

with Marshall, and they are not parties to this appeal.

4. Tammy and Marshall married sometime in 1996.

turned fourteen years old on January 5, 1997.

In April 1997, the family moved to Michigan. In the fall of 1997, they moved back to Tennessee. By the spring of 1998, they relocated back to Huntington, Indiana, where they lived in various locations, including a house on Market Street. In the following couple of years, they also lived in the towns of Andrews and Marion. Eventually, the family returned to Huntington and lived on State Street.

While the family lived in a home on Market Street in Huntington, and J.B. was ten years old, Marshall began inappropriately touching her. He touched her breasts and penetrated her vagina with his fingers. J.B. explained, "It happened a lot." *Tr.* at 320. She said that things progressed, and she would have to touch Marshall's penis with her hand and mouth. He would also perform oral sex on her. When they moved to Andrews, J.B. said that in addition to the touching and oral sex, it was "intercourse all the time." *Id.* at 322. It continued to happen when they moved to State Street in Huntington.

In August 2001, K.B. married and resided with her husband in Huntington. That same year, Marshall, Tammy, and J.B. moved to Tennessee. Marshall was arrested on a domestic issue where, according to J.B., Marshall "almost killed" her mother. *Id.* at 326–28. It was during the time when Marshall was incarcerated on charges related to that domestic incident that J.B. made a report to Tennessee authorities regarding Marshall molesting her in the past. Thereafter, J.B. received a telephone call from Marshall in jail, and he threatened to "kill everybody" when he was released. J.B. subsequently retracted her allegations. *Tr.* at 329. Tammy and Marshall separated in November 2003. Marshall eventually relocated to Florida and then Arizona for his employment.

In 2006, K.B. revealed to her husband what Marshall had done to her as a child. After sharing this information with her husband, K.B. then discussed it with her mother and her sister, J.B., who were at that time living in Tennessee. Thereafter, J.B. and her mother traveled to Huntington, and K.B. went with them to the Huntington authorities, where K.B. and J.B. each made a report to police about the molestations.

The State charged Marshall with six counts of child molesting, three counts involving J.B. and the other three involving K.B. Subsequently amended, the charges alleged that Marshall committed the following with K.B. and J.B., both less than fourteen years of age during the charged periods: (1) Class A felony child molesting when he performed or submitted to sexual intercourse with J.B. during the period between July 1997 and July 2000; (2) Class A felony child molesting when he performed or submitted to deviate sexual conduct with J.B. during the period between July 1997 and July 2000; (3) Class A felony child molesting when he performed or submitted to deviate sexual conduct with J.B. during the period between July 1996 and July 1997; (4) Class A felony child molesting when he performed or submitted to sexual intercourse with K.B. during the period between July 1, 1996 and January 4, 1997; (5) Class A felony child molesting when he performed or submitted to deviate sexual conduct with K.B. during the period between July 1, 1996 and January 4, 1997; and (6) Class B felony child molesting when he performed or submitted to sexual intercourse with K.B. during the period between the summer of 1995 and June 30, 1996. A few days prior to trial, the State dismissed count 3.

Prior to trial, the State filed a motion in limine requesting that the trial court preclude Marshall from referring to a certain

alleged drug transaction involving K.B.'s then-husband and himself; the trial court granted that motion.

During his three-day jury trial in the fall of 2007, Marshall was not handcuffed at any time while in the courtroom. Marshall posed repeated objections during trial to the testimonies of K.B. and J.B. describing acts of molestation, which Marshall alleged did not pertain to the charges pending against him. The trial court overruled the objections, but recognized the continuing nature of the objections. Marshall testified and denied that any molestations ever occurred.

During trial, Marshall also objected, but was overruled, when J.B. testified that Marshall "almost killed" her mother, *Tr.* at 326–28, and when the State questioned Marshall about an aggravated kidnapping charge he faced in Tennessee. *Id.* at 630–32. During his case-in-chief, Marshall presented testimony regarding a business transaction he had with K.B.'s husband, but the court prohibited any testimony of it being drug-related.

The jury convicted Marshall as charged. The trial court sentenced him to concurrent forty-eight-year terms for the first two Class A felony convictions (related to the molestations of J.B.) and concurrent forty-eight-year terms for the next two Class A felony convictions (related to the molestations of K.B.). For the Class B felony conviction, the court sentenced Marshall to an eighteen-year term, which ran concurrently to the second set of class A felonies. The trial court ordered the two forty-eight-year terms to run consecutively to each other, for a total executed sentence of ninety-six years. Marshall now appeals.

## DISCUSSION AND DECISION

### I. Admission and Exclusion of Evidence

 The evidentiary rulings of a trial court are afforded great deference. *Nor-*

*ton v. State,* 785 N.E.2d 625, 629 (Ind.Ct. App.2003). We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Southern v. State,* 878 N.E.2d 315, 321 (Ind.Ct.App.2007), *trans. denied* (2008). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* We will reverse only when a manifest abuse of discretion denies the defendant a fair trial. *Norton,* 785 N.E.2d at 629.

### A. Evidence of "Other Bad Acts" involving K.B. and J.B.

Marshall contends that the trial court improperly admitted evidence of uncharged misconduct in violation of Ind. Evidence Rule 404(b). Specifically, Marshall claims that the trial court erred by allowing K.B. and J.B. to testify regarding other "uncharged sexual encounters" between him and each of them, which damaged his credibility.

 Evid. R. 404(b) provides in relevant part that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The underlying rationale for the rule is that the jury is precluded from making the "forbidden inference" that the defendant has a criminal propensity and therefore committed the charged conduct. *Gillespie v. State,* 832 N.E.2d 1112, 1117 (Ind.Ct.App. 2005). Stated differently, the rule was designed to prevent a jury from assessing a defendant's present guilt on the basis of his past propensities. *Greenboam v. State,* 766 N.E.2d 1247, 1252 (Ind.Ct.App.2002), *trans. denied* (citing *Hicks v. State,* 690 N.E.2d 215, 218 (Ind.1997)). The rule does not, however, bar evidence of uncharged criminal acts that are "intrinsic"

to the charged offense.[5] *Garner v. State,* 754 N.E.2d 984, 992 (Ind.Ct.App.2001), *vacated in part but summarily affirmed on this issue,* 777 N.E.2d 721, 723 n. 4 (Ind. 2002).

In *Garner,* the State charged Garner with three counts of child molesting that occurred "sometime during the months of July, August, September, October, and/or November 1999." 754 N.E.2d at 989. During trial, the victim, T.C., testified about various and multiple occasions that Garner had engaged her in sex acts. A jury convicted Garner as charged. On appeal, he claimed, among other things, that the trial court erred in admitting other incidents of sexual conduct between him and T.C., claiming that the evidence was inadmissible under Evid. R. 404(b). In analyzing his claim, we observed that each of the acts to which T.C. testified was direct evidence that Garner committed the charged offenses. That is, the challenged evidence "was not evidence of another bad act occurring at another time offered only to create the inference that Garner is a man of bad character." *Id.* at 993. Rather, the evidence "was direct evidence that Garner molested T.C. during the charged time period." *Id.* Accordingly, this court concluded that there was no error in the admission of T.C.'s testimony. *Id.*

■ Similarly, here, the repeated molestations that K.B. and J.B. described in their testimonies fell within the respective time periods outlined in the charging informations. First, with regard to K.B. she testified that Marshall began molesting her in their home on Main Street in Huntington, where she lived beginning in 1995, and that it ended by the time she turned fourteen in January 1997. The various charges against Marshall as related to

K.B. extended from the summer of 1995 to January 4, 1997, when K.B. turned fourteen. The facts to which she testified occurred within the limitations period of charges 4, 5, and 6 and were direct evidence that Marshall committed child molestation as alleged. As such, the evidence was intrinsic to the charge of child molesting and therefore outside Evid. R. 404(b).

Likewise, with respect to J.B., her testimony concerned incidents that fell within the charging informations, which alleged that he molested her between July 1997 and July 2000. She said Marshall began touching her when she was ten years old and they lived on Market Street in Huntington, and it continued and progressed to oral sex and intercourse while they lived in two residences in Andrews, Indiana, and back in Huntington on State Street. This all occurred before she first reported the abuse to authorities in Tennessee in 2001, when she would have been fourteen or fifteen years old. These incidents occurred within the charged time period and were direct evidence of the charges against Marshall.

Marshall urges us to find *Garner* inapplicable to this case because "it is not clear whether Garner denied the inappropriate touching," but Marshall expressly denied that the touches ever happened. *Reply Br.* at 3. We are not persuaded that this distinction, if it exists, makes any difference. Rather, we conclude that, as we previously stated in *Garner,* the challenged testimonies of K.B. and J.B. were "not evidence of 'other' wrongs, but of the charged offense[s]." 754 N.E.2d at 993.

Marshall also argues that *Greenboam,* not *Garner,* should control our decision today. *Reply Br.* at 3. We disagree.

---

**5.** Other crimes or wrongs are termed "extrinsic" if they occurred at different times and under different circumstances from the charged offense. *Garner,* 754 N.E.2d at 992–93.

*Greenboam* concerned the appropriateness of admitting the defendant's previous convictions for molesting the victims pursuant to the exception to Evid. R. 404(b), which states that evidence of other misconduct is not admissible except as proof of motive, intent, preparation, *plan,* knowledge, identity, or absence of mistake or accident. (Emphasis added.) 766 N.E.2d at 1252–55. A majority of this court determined that evidence of the prior convictions served only to establish Greenboam's propensity to commit child molesting and was inadmissible. *Id.* at 1255 (Bailey, J., dissenting).

Unlike in *Greenboam,* the evidence in the present case was not presented to establish an exception to 404(b), such as motive or intent or plan; rather, it was presented as direct evidence of the charged molestations. In the end, we find the facts of *Garner* much more analogous to those presented today, and we discern no error in the admission of K.B. and J.B.'s testimonies giving detailed descriptions of Marshall's repeated molestations, which occurred within the charged time frames.

### B. Criminal Conduct in Tennessee

■ Marshall complains that the trial court erred when it allowed into evidence testimony that Marshall was charged in Tennessee with aggravated kidnapping stemming from a domestic dispute involving his wife, Tammy, and J.B. The gist of Marshall's argument is that because no criminal conviction resulted from the incident, the testimony about it was essentially improper character evidence that resulted in an unfair trial. We disagree.

Initially, we note that the trial court determined that Marshall opened the door to such evidence when, during opening statement, Marshall's counsel referred to the fact that although J.B. reported to Tennessee authorities in 2001 that Marshall had molested her years prior, she thereafter "recanted" her statement. *Tr.* at 201. During trial, in order to explain or rebut the suggestion that J.B. "recanted," or that her report to authorities had been false, the State presented evidence that Marshall threatened J.B. and caused her to withdraw her original report of the molestations. Specifically, the State presented evidence that, while in Tennessee, Marshall was arrested on a domestic charge involving both J.B. and Tammy. Because of that arrest, Marshall was incarcerated on a probation violation. J.B. testified that Marshall telephoned her from jail, informed her that he was aware that she had made the report of molestation, and he threatened to "end everybody's life" if she did not "drop the charges." *Id.* at 330. As a result, J.B. wrote a letter to the detective to whom she had reported the abuse and withdrew her allegations, saying that she had fabricated them.

Marshall timely objected during J.B.'s testimony and argued that the line of questioning was improper and should be excluded under Evid. R. 404(b) as uncharged misconduct offered only to show Marshall's character and prove he acted in conformity with that character when he molested J.B. and K.B. The trial court overruled the objection and determined that Marshall's counsel opened the door and that the State would be permitted to explain why J.B. withdrew her prior allegations to police. We see no error in the trial court's ruling. *See Sundling v. State,* 679 N.E.2d 988, 996–97 (Ind.Ct.App.1997) (Chezem, J., dissenting).[6]

---

**6.** In *Sundling,* the dissenting opinion discussed the fact that during voir dire the defendant had, as part of his defense that the victims were mistaken about the molestations having occurred, suggested to the jury that child witnesses were not credible. The *Sun-*

However, regardless of whether Marshall opened the door to the subject, he was responsible for a significant amount of the testimony presented on the matter. That is, although Marshall objected but was overruled on a couple of occasions when the subject matter was approached,[7] other times testimony on the matter came in without objection or even upon his own inquiry. For example, defense counsel solicited information from Tammy on cross examination when he asked her about assault allegations and Marshall being jailed. *Id.* at 403–04. Later, Marshall's counsel questioned Marshall on direct examination about the charges of aggravated assault, aggravated kidnapping, domestic assault, and reckless endangerment. *Id.* at 633. In fact, Marshall acknowledges in his brief, and we agree, that at trial Marshall "discuss[ed] his arrest for aggravated kidnapping, and the circumstances surrounding it, in detail and, for the most part, without objection" and "that to an extent, he opened the door during direct examination by alluding to an "incident" in which he pulled [J.B.'s] hair." *Appellant's Br.* at 12. Marshall also concedes "that the State had a right to ask whether there was more to his hair-pulling story." *Id.* at 13.

Based on the record before us, we are not persuaded by Marshall's claim that the State presented improper character evidence that requires reversal of his convictions.

*C. Exclusion of Drug Transaction*

■ Marshall argues that the trial court erred when it precluded him from presenting evidence of an alleged drug transaction involving him, K.B.'s husband, Brian, and Brian's brother. Marshall sought to introduce the evidence to support his theory that K.B. fabricated her story of molestations because she was angry with Marshall for failing to complete a drug deal involving her husband that allegedly would have earned them thousands of dollars. Marshall's claim is that the trial court's ruling prevented him from presenting his full defense.

Prior to trial, the State filed a motion in limine seeking to preclude testimony about any drug transaction involving Marshall, Brian, and his brother, Adam, asserting that evidence of the illegal transaction that Marshall sought to introduce was irrelevant and should be excluded under Evid. R. 401 and 403. The trial court granted the motion.

During his case-in-chief, Marshall presented testimony concerning a "business transaction" between him, Brian, and Adam. *Tr.* at 620–21. Marshall explained that the business deal "fell through" and K.B. was upset about it. *Id.* The court also permitted testimony that the failed transaction resulted in financial hardship on K.B. and her family. At the conclusion of Marshall's evidence, he made an offer to prove outside of the jury's presence, explaining that the proffered evidence of a failed drug deal was relevant to show that K.B. had a motive to fabricate her allegations of molest because Marshall failed to

---

*dling* dissent, J. Chezem, asserted that it was appropriate for the State in its case in chief to rebut such a suggestion, stating, "It would be unfair to the State to require that it wait until the defense has yet a second chance in its case in chief to present additional matter on the same issue raised in voir dire." 679 N.E.2d at 996. It continued, "The same is true if the defense postures itself accordingly

in its opening statement." *Id.* at 996–97. We agree with this reasoning.

7. For instance, Marshall objected when J.B. testified that Marshall "almost killed" her mother, *Tr.* at 326–28, and when the State questioned Marshall about an aggravated kidnapping charge he faced in Tennessee. *Id.* at 630–32.

bring the business transaction to a successful conclusion.

As Marshall observes, a party may introduce evidence of motive to fabricate, and "[a] witness's bias, prejudice, or ulterior motives are always relevant at trial in that they may discredit her or affect the weight of her testimony." *Appellant's Br.* at 15 (quoting *Dyson v. State,* 692 N.E.2d 1374, 1376 (Ind.Ct.App.1998)). We do not dispute that a witness's motives are relevant; however, Marshall fails to consider that relevant evidence may nonetheless properly be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Evid. R. 403.

Here, the trial court permitted testimony regarding the proposed business transaction involving the three men and the resulting effect on K.B. and her family when the deal did not transpire as planned. Marshall sought to establish that K.B. fabricated her story because she was angry with Marshall for failing to complete the deal. Marshall was able to present this theory to the jury under the parameters of the motion in limine. As the State urges, "There was nothing to be gained by describing the already disclosed business transaction as a drug deal." *Appellee's Br.* at 14. We find no error in the trial court's decision to exclude any evidence that the business transaction purportedly involved drugs.

## II. Appearance in Handcuffs

 Marshall asserts that he lost "valuable credibility when he appeared before the jury in handcuffs," and that the trial court erred by failing to make a specific finding as to why Marshall needed to appear in handcuffs. *Appellant's Br.* at 5, 13. In support of his argument, Marshall cites to *Stephenson v. State,* 864 N.E.2d 1022, 1029 (Ind.2007), *cert. denied* —— U.S. ——, 128 S.Ct. 1871, 170 L.Ed.2d 751 (2008), for the proposition that a trial court must make a particularized finding of need for shackles or handcuffs, and that because the trial court here did not make any such particularized finding, it committed reversible error.[8] Marshall's claim on this handcuffs issue is, at best, misguided, or, at worst, disingenuous.

As an initial matter, we note that Marshall was not in any way restrained, either by handcuffs or shackles, during his trial or in the courtroom. Thus, there was no requirement upon the trial court to make any particularized finding as in *Stephenson.*

Here, at one point during the State's case in chief, Marshall's counsel, outside the jury's presence, voiced Marshall's "concern" to the court that the jury or some of its members may have or did observe Marshall being transported in handcuffs "as he came up the steps." *Id.* at 302, 304. This is not direct evidence that anyone actually saw Marshall in handcuffs, and even if someone had, that fact would not impose any requirement upon a trial court to make a particularized finding of need. Furthermore, Marshall's "concern" was not an objection that required the court to rule. Nor was it a request for a mistrial or some form of remedy. Nevertheless, the court responded to the concern by first observing, "I have him in street clothes, ... he has been as free around here as the rest of us, with the exception of leaving the courtroom with an officer," but the court nevertheless assured Marshall that he would instruct the officers to be certain that the jurors were gone before they "[took] him back over."

---

**8.** In *Stephenson,* the defendant appeared during an eight-month trial in shackles and jail garb.

*Id.* at 305. This was a reasonable cure to Marshall's concern.

Marshall has not demonstrated that he suffered actual harm by the possibility that the jury or any members of it may have seen him being transported inside or outside the courthouse in handcuffs. Indeed, "Even if the jurors had seen [him] in handcuffs ... reasonable jurors can expect defendants to be in police custody while in the hallway of a courthouse." *Warr v. State,* 877 N.E.2d 817, 822 (Ind.Ct.App. 2007), *trans. denied* (2008).

We discern no reversible error with regard to the trial court's handling of this matter.

### III. Sentencing

█ For his five child molesting felony convictions, four Class A and one Class B, the trial court sentenced Marshall to two consecutive forty-eight year terms, for a total executed sentence of ninety-six years. Marshall requests that we reduce that sentence.

█ An appellate court may revise a sentence after careful review of the trial court's decision if it concludes the sentence is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). Recognizing the unique perspective that the trial court has when making sentencing decisions, we give due consideration to its sentencing decision. *Lopez v. State,* 869 N.E.2d 1254, 1257 (Ind.Ct.App.2007), *trans. denied.* Under App. R. 7(B), the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind.2006). Even if the trial court followed the appropriate procedure in arriving at its sentence, the appellate court still maintains a constitutional power to revise a sentence it finds inappro-

priate. *Hope v. State,* 834 N.E.2d 713, 718 (Ind.Ct.App.2005).

Marshall was convicted of four Class A felonies, two for each step-daughter. The advisory sentence for a Class A felony is thirty years, with the possibility of enhancement of twenty years or reduction of ten years. IC 35–50–2–4. In this instance, the trial court imposed an enhanced forty-eight year sentence for each conviction. However, the two convictions for K.B. ran concurrently to each other, and the same is true for the two convictions relative to offenses committed against J.B. The court ordered those pairs of concurrent sentences to run consecutively to each other, for ninety-six years of imprisonment. Marshall was also convicted of Class B child molesting, which carries an advisory term of ten years that can be reduced by four years or enhanced by ten years. IC 35–50–2–5. The trial court imposed an eighteen-year term, but ordered that it run concurrently to one of the two forty-eight-year terms.

Here, Marshall concedes that the nature of his offenses does not weigh in favor of sentence reduction. Instead, he maintains that, given his character, the ninety-six year sentence is inappropriate, specifically asking us to consider that: (1) the victims said that at times, he was a good father; (2) while in jail, he participated in drug and alcohol counseling, obtained his G.E.D., and became a jail trustee; and (3) this is the first offense of this nature. The trial court determined that these factors had little mitigating value, and we agree.

Marshall has not established that his character warrants any reduction in his sentence. Marshall concedes that he has a "lengthy criminal history," but he urges that the present convictions were the first offenses of this nature. *Appellant's Br.* at

16. His argument is not convincing. Marshall's character is best illustrated by his repeated decisions to, over the course of years, abuse the position of trust that he held with his two step-daughters, who saw Marshall as their primary father figure. His victimization of the two girls affected their lives not only then, but now, years later. We cannot say that his character establishes that the trial court's imposition of the two consecutive forty-eight-year sentences was inappropriate.

Affirmed.

FRIEDLANDER, J., and BAILEY, J., concur.