**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 21 2012, 9:12 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW J. MCGOVERN**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GEORGE P. SHERMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| PHAROAH D. NEWTON, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| vs. | ) No. 82A01-1111-CR-507 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee. | ) |

APPEAL FROM THE VANDERBURGH CIRCUIT COURT
The Honorable Carl A. Heldt, Judge
The Honorable Kelli E. Fink, Magistrate
Cause No. 82C01-1010-MR-1187

**September 21, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

<u>STATEMENT OF THE CASE</u>

Pharoah D. Newton appeals his conviction of and sentence for murder, a felony.[1]

We affirm.

<u>ISSUES</u>

1.      Whether the trial court abused its discretion in admitting certain evidence.

2.      Whether the trial court imposed an inappropriate sentence.

<u>FACTS</u>

Beginning in late August or September of 2010, seventeen-year-old Newton and his father, Henry Newton ("Henry"), were living rent free in the basement apartment of a Vanderburgh County house owned by seventy-nine-year-old Frances Wolf.  In October 2010, Wolf began the process of moving to a new residence.  Newton and Henry, as well as local homeless persons, helped to facilitate the beginning of the move.

On Friday, October 1, 2010, Henry went to Chicago, leaving Newton to occupy the basement apartment of Wolf's house.  Henry returned to the basement apartment on Sunday morning.

Meanwhile, Newton went to his great-grandmother's residence in Carrier Mills, Illinois, on Saturday.  While there, Newton showered and left a suitcase with his great- uncle, Terrance Smith, who was living at the Carrier Mills residence.  On the same day, in a rural area near Carrier Mills, Aundreya Drue noticed a trash bag on her property.  Inside the bag,

---

[1] Ind. Code § 35-42-1-1.

2

Drue discovered bloody clothes, gloves, shoes, and a bloody knife. Upon Drue's call, local police obtained the bag, and a forensic analyst determined that Wolf's DNA was on the shoes as well as an unknown profile from which Newton could not be excluded. Wolf's DNA was also found on the knife. On the exterior of the glove, the DNA analyst detected the presence of Wolf's DNA, and on the interior of the glove, the analyst detected a mixture for which Wolf and Newton were included as contributors.

On Sunday morning, two of Wolf's friends went to her house and noted that her van was gone. The friends entered the house and discovered Wolf's bloody body lying in a second floor bedroom. One of the friends noted that Henry was present and called the police.

Later that same day, in Harrisburg, Illinois, Newton's mother, Cassandra Smith, learned that Wolf had been murdered and that her van had been stolen. Newton took Smith to the van, which was parked within walking distance of Newton's great-grandmother's residence. Smith called a friend, Thomas Sanders, and asked him to "take a ride with her." (Tr. 823). Smith drove the van to Kentucky, with Sanders and Newton following in Smith's vehicle. When they reached Kentucky, Sanders removed the license plate, and Smith poured gasoline on the van and burned it. The three of them left in Smith's vehicle, and at some point during the trip, Sanders tossed the license plate over a bridge.

On Wednesday, October 6, 2010, Smith called her pastor, Bishop Cofield, and told him that something was wrong with Newton. When Bishop Cofield arrived at Smith's residence on Saturday, October 9, 2010, he found Newton, Smith, Henry, and Sanders

awaiting him. Bishop Cofield took Newton to the garage while the rest of the occupants waited in the living room. While the two were standing in the garage, Newton told Bishop Cofield that he "went to basically rob the old lady," she was going to call the police, they fought, he slashed her, and he panicked. (Tr. 869). Bishop Cofield asked, "Well, what do you mean you panicked?" (Tr. 870). Newton replied, "I stabbed her." *Id.* Bishop Cofield subsequently notified the police and Newton was arrested. At the time of Newton's arrest, he had an abrasion on his left shoulder, discolored areas on his hand that were consistent with bruising or a contusion to the hand, a laceration on his index finger, and blood blisters on his palm.

On the same day, Detective Stacy Spaulding and Evansville Police Officers went to the Carrier Mills, Illiniois residence where Newton had left the suitcase the previous week. Terrance told them that Newton had not returned to the house after October 2, 2010. Terrance eventually showed the others a suitcase and told the police that "we share clothes and I . . . I have clothes in there." (Tr. 438). Officers asked Terrance if they could look inside the suitcase with him to determine which clothes were his and Smith agreed, indicating he did not want to lose his clothes. (Tr. 439). When they opened the suitcase, officers saw bank checks in Wolf's name. The officers also saw an identification card or driver's license of an Oklahoma resident to whom the checks were written. The person's picture on the identification card had been tampered with. Although the checks appeared to be signed by Wolf, an analysis of the checks revealed that Newton wrote and signed them.

4

At Wolf's home, crime scene investigators surmised from the blood spatter evidence that Wolf was initially attacked at the top of the stairs, but concluded that the attack moved to the bedroom where she was eventually killed. Officers discovered a t-shirt in the bedroom that had two holes cut out of it, leading them to conclude that it was used as a mask. The DNA forensic analyst discovered both Wolf's and Newton's DNA on the shirt. In the basement apartment, officers discovered a blood stain on the basement couch and a smear of blood on the doorknob to the basement door exiting to the outside. Newton's DNA was on the doorknob, and Wolf could not be excluded as a contributor to the DNA. Newton's blood was also discovered on the door handle of the rear main level door.

An autopsy revealed that Wolf sustained multiple stab wounds to her chest and neck. She had defensive wounds on her arms. However, the pathologist testified that Wolf died as a result of a cerebral edema caused by blunt force injury. The pathologist believed that this blunt force injury was inflicted on Wolf's face as evidenced by what appeared to be a shoe print on her cheek.

Newton was tried as an adult, and a jury found him guilty of murder. The trial court sentenced him to a sixty-year executed term of imprisonment.

Additional facts will be disclosed below as necessary.

DECISION

1.    <u>Admission of Evidence</u>

Newton contends that the trial court abused its discretion when it admitted into

5

evidence the objects found in the suitcase. Specifically, Newton argues that the State violated his federal constitutional right to be free of unreasonable search and seizure. Newton claims that the State failed to establish that Terrance had either actual or apparent authority to consent to the warrantless search of the suitcase.[2]

A trial court's evidentiary rulings are afforded great deference. *Marshall v. State*, 893 N.E.2d 1170, 1174 (Ind. Ct. App. 2008). We review such decisions for an abuse of discretion. *Id*. An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id*.

The Fourth Amendment to the United States Constitution protects citizens from warrantless searches of places or items in which the individual has an actual, subjective expectation of privacy. *Trowbridge v. State*, 717 N.E.2d 138, 143 (Ind. 1999). "The fundamental purpose of the Fourth Amendment is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes and their belongings." *State v. Friedel*, 714 N.E.2d 1231, 1237 (Ind. Ct. App. 1999) (quoting *People v. James*, 163 Ill.2d 302, 206 Ill.Dec. 190, 645 N.E.2d 195, 197-98 (1994) (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). For a search to be reasonable under the Fourth Amendment, a warrant is required unless an exception to the warrant requirement applies. *Id*. The State bears the burden of proving that a warrantless search falls within an exception to the warrant requirement. *Id*.

---

[2] Defense counsel proffered a motion to suppress all evidence obtained from the suitcase on the grounds that the evidence was obtained in violation of the Fourth Amendment. After a hearing, the trial court denied the motion. Defense counsel renewed his motion to suppress when the State made its first reference to the offending evidence and asked the trial court to incorporate his previous arguments and to recognize a

6

An exception exists where a third party has actual or apparent authority to consent to the search of an absent, non-consenting party's property. *Krise v. State*, 746 N.E.2d 957, 964 (Ind. 2001). A third party has actual authority to consent to a search of an absent, non-consenting party's property when there is a sufficient relationship to the property or "mutual use of the property by persons generally having joint access or control for most purposes." *Id.* (quoting *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974)). If actual authority cannot be shown, then facts demonstrating that the consenting party had apparent authority to consent may prove a lawful search. *Id.* Apparent authority is present if the facts available to the officers at the time of the search would warrant a person of reasonable caution to believe that the consenting party had authority to give consent. *Godby v. State*, 949 N.E.2d 416, 420 (Ind. Ct. App. 2011), *trans. denied*.

Here, both parties agree that Terrance was living at his mother's house when Newton stopped by to take a shower and leave the suitcase. Thus, there is no disagreement about Terrance's actual authority to give consent to search the house. The question remains, however, whether the State proved that Terrance had authority to consent to the search of the suitcase in the house. Because Terrance testified at the suppression hearing that he did not share common ownership of the suitcase, the State argued that consent to search the suitcase was established by apparent authority.

At the time that the investigating officers arrived at the house, Terrance was

---

continuing objection. The trial court granted the continuous objection; however, trial counsel continued to object each time the State introduced evidence related to the suitcase.

7

entertaining friends. When the officers began asking Terrance about Newton, he remarked that Newton had left the suitcase at the house. Terrance and an Evansville detective then went into the house to retrieve the suitcase, which was sitting outside Terrance's mother's bedroom door. It was at that this point that Terrance told the officers that he had clothes in the suitcase and that he would like to get his clothes back before the suitcase was confiscated. The officers then asked whether they could look at the contents of the suitcase in Terrance's presence, and he agreed. Terrance and the officers stood on the porch as one of the officers removed items from the suitcase. Under the circumstances, a person of reasonable caution would have believed that Terrance, who claimed to have property in the suitcase, had the authority to consent to a search thereof. *See Trowbridge*, 717 N.E.2d at 144 (holding that the warrantless search of a tackle box found on the patio of the defendant's mother's trailer was reasonable in light of the surrounding circumstances, including the location of the box in a common area and the assurance of the mother's boyfriend that he had common authority over the box).

Newton cites *U.S. v. Waller*, 426 F.3d 838 (6th Cir. 2005) in support of his argument that the officers could not have reasonably believed that Terrance had authority to give consent to search the suitcase. In *Waller*, the defendant left a luggage bag in a bedroom closet of a friend's apartment. The court found the location of the bag, among other things, to be an indication that the friend did not have common authority over Waller's bag. The court further found it significant that the bag contained only Waller's property. Here,

8

however, Newton made no effort to secure the suitcase in a closet, under a bed, or in some other "secure" place. Instead, he left the suitcase in a common area where not only Terrance, but his friends, could access it. More importantly, Terrance informed the officers that the suitcase contained his clothes; thus, he implied that he had authority to open the suitcase and retrieve the clothes. *Waller* is inapposite.

As a result, the trial court did not err in admitting evidence contained within the suitcase.

2.    <u>Inappropriate Sentence</u>

Newton contends that the sentence imposed by the trial court is inappropriate. He argues that the sentence is inappropriate based upon both the nature of the offense and the character of the offender.

After hearing the evidence, the trial court found the following aggravating circumstances: (1) Newton had a 2009 juvenile adjudication for theft and Wolf's murder resulted from what began as an act of theft; (2) Wolf was over sixty-five years of age at the time Newton killed her; (3) Newton abused Wolf's kindness as a hostess by robbing and killing her in the safe haven of her home, and, in doing so, inflicted numerous injuries that were not required to effect the murder; and (4) Newton took action to avoid detection and/or conceal evidence in three states. The trial court found Newton's age to be a mitigating circumstance; however, the court determined that the weight of this factor was diminished by his juvenile history. The trial court noted that only one of several incidents from Newton's

9

juvenile history resulted in adjudication; therefore, the court did not "count" them as adjudications but as indicators of someone who has not benefited by contact with the legal system. (Tr. 1191). Specifically the court stated, "So I still give his age weight as a mitigating circumstance but not as much weight as I would give it if he had had absolutely no contact with any of the juvenile system or criminal system." *Id.*

Indiana Code § 35-50-3-2(a) provides that a person who commits murder "shall be imprisoned for a fixed term of between forty-five (45) and sixty-five (65) years, with the advisory sentence being fifty-five (55) years." Here, the court considered the aggravating and the mitigating circumstances and imposed a sixty-year sentence.

The revision of a sentence is authorized by the Indiana Constitution through Indiana Appellate Rule 7(B), which provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In determining the appropriateness of a sentence, a court of review may consider any factors appearing in the record. *Schumann v. State*, 900 N.E.2d 495, 497 (Ind. Ct. App. 2009). The "nature of the offense" portion of the appropriateness review begins with the advisory sentence. *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007), *clarified on reh'g by Anglemyer v. State*, 875 N.E.2d 218 (Ind. 2007); *Richardson v. State*, 906 N.E.2d 241, 247 (Ind. Ct. App. 2009). The "character of the offender" portion of the sentence review refers to general sentencing considerations and the relevant aggravating and mitigating circumstances.

*Major v. State*, 873 N.E.2d 1120, 1130 (Ind. Ct. App. 2007), *trans. denied*. The weight assignable to aggravating and mitigating circumstances is not subject to review for abuse of discretion. *Anglemyer*, 868 N.E.2d at 491.

Regarding the nature of the offense, we note that Newton responded to the kindness of an elderly woman who provided him with a free home by stealing her property and murdering her. Newton not only murdered Wolf by stomping on her head, he stabbed and cut her numerous times with a knife, thus inflicting injuries that were greater than those necessary to accomplish the homicide. Indiana Code § 35-38-1-7.1 lists particularized circumstances that warrant a finding of aggravating circumstances; both the age of the victim (at least sixty-five at the time of the offense) and the viciousness of the crime are included in this list. In light of these particularized circumstances, coupled with Newton's post-murder actions involving three states, we cannot say that the trial court's sentence of sixty years is inappropriate.

Indiana Appellate Rule 7(B) requires a defendant to demonstrate that his sentence is inappropriate in light of *both* the nature of the offense and his character. *Williams v. State*, 891 N.E.2d 621, 633 (Ind. Ct. App. 2008). Because Newton has failed to show that the imposed sentence is inappropriate in light of the nature of the offense, we need not consider the nature of his character.

Nevertheless, we note that although a defendant's youth can be a significant sentencing fact, its significance is diminished in this case. Seventeen-year-old Newton does

11

not lack experience in the judicial system; indeed, his first contact with the system came at the age of thirteen or fourteen. Furthermore, Newton did not engage in a youthful indiscretion. He took advantage of an elderly woman's kindness and perceived unwariness to take her property, and when caught in the act, he brutally took her life.

As the Indiana Supreme Court observed in *Ellis v. State*, 736 N.E.2d 731, 736 (2000), "[f]ocusing on chronological age is a common shorthand for measuring culpability, but for people in their teens and early twenties it is frequently not the end of the inquiry. There are both relatively old offenders who seem clueless and relatively young ones who appear hardened and purposeful." Newton is one of the latter, and his sentence is not inappropriate.

Affirmed.

FRIEDLANDER, J., and BROWN, J., concur.